In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-16-00339-CV**

_____

**SAM RAYBURN MUNICIPAL POWER AGENCY, Appellant**

**V.**

**RALPH J. GILLIS, GILLIS BORCHARDT & BARTHEL LLP,
OBAIN ASSOCIATES LIMITED AND THE
JASPER/VPPA SETTLEMENT TRUST, Appellees**

**On Appeal from the 253rd District Court
Liberty County, Texas
Trial Cause No. CV1408743**

## MEMORANDUM OPINION

This appeal involves two complex energy projects and the relationship between the members of the projects and an attorney that assisted the members in structuring both projects. Sam Rayburn Municipal Power Agency (SRMPA, Plaintiff, Appellant or Cross-Appellee) is a municipal energy provider, organized in 1979 by ordinances of three Texas cities: Jasper, Livingston, and Liberty. SRMPA purchases electrical power wholesale and sells it to (1) its constituent members

Jasper, Livingston, and Liberty, (2) Vinton Public Power Authority (VPPA), which is the electrical power arm of Vinton, Louisiana, and (3) other potential buyers. SRMPA filed suit against its former attorney, Ralph J. Gillis (Gillis), and Gillis's law firm, Gillis Borchardt & Barthel LLP[1] (the Gillis Firm), Obain Associates Limited (Obain), and the Jasper/VPPA Settlement Trust (the Trust) (collectively Defendants or Appellees) regarding what the parties referenced as the "Nisco Deal" and the "Cambridge Project." SRMPA alleged that Gillis and the Gillis Firm acted as SRMPA's "general counsel" at the time of both projects and that Gillis engaged in wrongful conduct causing damages to SRMPA. It is undisputed that SRMPA was not a participant in the Nisco Deal. SRMPA claims that Gillis failed to disclose the opportunity to participate in the Nisco Deal to SRMPA. And, SRMPA contends in its appellate brief that:

> By using his alter ego, Obain Associates Limited (of which Gillis was the undisclosed principal), [], and intermediary trusts that Gillis also created, [], Gillis concealed from his client, SRMPA, that he would be personally receiving millions of dollars from each of these two sets of contracts. [] Gillis is even yet scheduled to receive an additional $1 million per year from the Cambridge Project until 2036, approximately another twenty million dollars. []

---

[1] Gillis testified that Gillis, Borchardt & Barthel LLP was formerly known as Gillis & Angley, LLP. An exhibit introduced and admitted at trial included an annual report filed with the Massachusetts Secretary of the Commonwealth, Corporations Division, on March 1, 2013 by Gillis, Borchardt & Barthel LLP noted the partnership name changed when Edward Angley retired.

SRMPA also alleged that the City of Jasper and the Trust knowingly participated in Gillis's conduct.

Gillis denied the allegations made by SRMPA, and the City of Jasper and the Trust also denied the allegations. The Trust filed a counterclaim against SRMPA for contractual indemnity and filed a motion to bifurcate the counterclaim because "[n]o party has alleged that the indemnity provision at issue is ambiguous, so there is no liability issue to be submitted to the jury as to the [indemnity] [c]laim." The trial court signed an Order Bifurcating the Trust's Indemnity Claim Against Plaintiff, and reserving the counterclaim for post-verdict consideration by the trial court.

The claims of SRMPA were tried to a jury. In a 10-2 verdict, the jury responded "No" to the first question, "Did Gillis comply with his fiduciary duty to SRMPA regarding the NISCO Deal[.]" In response to the fourth question, the jury awarded $5,000,000 in damages for the Nisco Deal. In the fifth question the jury found that Gillis fraudulently concealed his breach of fiduciary duty in connection with the Nisco Deal. In the sixth question the jury was asked to find the date on which SRMPA obtained sufficient knowledge that would have required a reasonably prudent person to make an inquiry that, if pursued would lead to discovery of the breach, and the jury answered: "March 27, 2001." In response to the seventh question, the jury answered "No" to the question, "Did Gillis comply with his

3

fiduciary duty to SRMPA regarding the Cambridge Project[.]" In response to question ten, the jury awarded SRMPA past damages of $1,799,059 for the Cambridge Project, but no future damages. In response to question eleven, the jury found that Gillis complied with his fiduciary duty to SRMPA with respect to the cost of transmission upgrades. In response to question two, the jury found that the City of Jasper did not knowingly participate in Gillis's conduct regarding the Nisco Deal. In response to question eight, the jury found that neither the City of Jasper nor the Trust knowingly participated in Gillis's conduct regarding the Cambridge Deal. The jury answered "yes" to question thirteen, asking whether Obain was responsible for the conduct of Gillis. Ten of the members of the jury also answered "yes" that the harm to SRMPA resulted from gross negligence, malice, or fraud, but the jury left blank the answer of the amount of exemplary damages and that question required the jury to unanimously agree upon its answer.

The trial court struck the jury's answer to question fourteen asking whether the harm to SRMPA resulted from gross negligence, malice or fraud, because the question's predicate required a unanimous answer and only ten of the twelve jurors agreed, and the court concluded that the jury plainly erred by answering the question "on less than a unanimous vote and by not complying with the Question's predicate[.]" Because of the jury's response to question six, the trial court concluded

4

that the claims against Gillis and the Gillis Firm as to the Nisco Deal were barred by limitations. The trial court then awarded SRMPA $1,799,059 in damages for the Cambridge Project in past damages and no future damages, denied the Trust's indemnity claim, and ordered SRMPA to pay all of the Trust's costs of court. SRMPA appealed, and Gillis, Obain, and the Trust cross appealed. We affirm the trial court's judgment.

Background Facts

Gillis is an attorney and, according to all parties, Gillis is knowledgeable regarding the law, regulations, and contractual aspects of acquiring and selling electrical power. Gillis represented SRMPA and VPPA for more than thirty years as legal counsel in various energy transactions and projects.

According to the Plaintiff's Fifth Amended Petition, the live pleading at the time of trial (hereinafter "the petition"), SRMPA alleged that Gillis structured business transactions that affected his client's interests, Gillis utilized separate legal entities of his creation that disguised the arrangements of the projects and that he was making over $1 million yearly for over twenty years from the projects. The Plaintiff alleged that Gillis, the Gillis Firm, and the entities he created, were liable to SRMPA on theories of breach of fiduciary duty, fraud, unjust enrichment, money

5

had and received, alter ego, usurpation of opportunity, and interference with prospective contract.

Specifically, SRMPA complained in the petition about two energy arrangements or concepts, the "Nisco Deal" and the "Cambridge Project." SRMPA alleged that Gillis failed to disclose to SRMPA that the contracts for the Nisco Deal violated SRMPA's rights under its Power Supply Agreement with VPPA, and SRMPA alleged that Gillis created Obain and the Trust to hide significant payments that Obain (and thereby Gillis) would be receiving as a result of the new contracts Gillis structured as part of the Nisco Deal. SRMPA also alleged Gillis and the parties to the Nisco Deal contracts entered into confidentiality agreements on Gillis's advice, and SRMPA was "deprived of its opportunity to participate in the Nisco Deal and has suffered damages in the amount of 50% of the Nisco Deal revenues generated during 2001 through 2011." SRMPA alleged that, until shortly before this lawsuit was filed, SRMPA never learned what the Nisco Deal was, that Entergy had brought the deal to Gillis as lawyer for SRMPA, that Gillis had taken the deal instead to Jasper and VPPA, or that Gillis was benefiting personally from it.

SRMPA alleged that in response to a change in gas prices that occurred in approximately 2003, amendments to the Nisco Deal agreements were made under Gillis's new concept, the Cambridge Project, and one of the necessary participants

6

of the Cambridge Project was SRMPA rather than Jasper. According to the petition, the Cambridge Project involved SRMPA, three Entergy affiliates, Jasper, VPPA and the Trust, and the Trust would receive the payments from SRMPA. SRMPA alleged that Gillis created the Trust to help disguise the fact that much of the money that SRMPA would be paying under the Cambridge Project was actually going to Obain and Gillis. According to the petition, Gillis, the Gillis Firm, Obain, and the Trust breached their fiduciary duty to SRMPA, Gillis and the Gillis Firm fraudulently concealed that Obain was a beneficiary of the Trust, Obain was Gillis's alter ego, and the Defendants were unjustly enriched.

Evidence Regarding the Nisco Deal[2]

The Nisco Deal was developed in the late 1990s, became operational in 2001, and continued in operation until December 1, 2011. The Nisco Deal was developed from certain losses Entergy Gulf States Louisiana, L.L.C. (Entergy) was experiencing in the 1990s from regulations, primarily in Texas, that affected Entergy's relationship with the owner of a power-generating operation fueled by "petcoke," a byproduct of three petrochemical plants and refineries near Lake Charles, Louisiana. Former Entergy officer John Hurstell testified that he contacted

---

[2] We have limited our discussion of the evidence in relation to the structure of the Nisco Deal and the Cambridge Project as necessary for the determination of the appellate issues presently before this Court.

7

Gillis about helping him structure a deal for Entergy to lower unrecovered costs. Hurstell and Gillis discussed an assignment of the retail loads to VPPA which would then have a "sleeve" that would be either SRMPA or Jasper. Gillis testified that he told Hurstell that Jasper or SRMPA could be the intermediary wholesale purchaser, and that Gillis preferred SRMPA because it was a stronger entity than Jasper. Gillis testified that at that time he did not know if SRMPA would be interested because SRMPA "was beginning to look at some structure to dissolve . . . and they had just spent a lot of money over two years to get [another agreement] negotiated and in place[,]" so Gillis suggested that Jasper be a "backup arrangement" if SRMPA "falls through."

According to Gillis, Hurstell told Gillis that Entergy agreed that VPPA could be the retail distributor and that Entergy wanted a confidentiality agreement regarding the potential assignment of the retail load to VPPA. Gillis testified that when he met in 1999 with representatives of VPPA, Vinton, and Jasper to discuss the potential deal, he was asked if he could work on a contingency basis and, although he was uncomfortable with a contingency fee instead of an hourly rate, he left the meeting with the understanding that one-third of whatever benefit the deal produced would be his contingency fee and that each of the participating cities would pay a share of that fee.

8

Bruce Halstead[3] and R.C. Horn[4], two former members of the SRMPA Board of Directors, testified that Gillis presented the Nisco Deal to the SRMPA Board in an executive session on January 26, 1999, but the SRMPA Board did not choose to participate in the Nisco Deal. An email dated March 20, 2001, from Gillis to the SRMPA Board President was also admitted into evidence. Bruce Halstead, who served as an SRMPA Board member starting in the summer of 1998 and who was elected as the SRMPA Board President in August of 1999, testified that the email

[3] According to the appellate record, in 1998, Halstead was elected as the Mayor of Liberty, Texas, and when he ran for that position, he ran "on the issue of electricity." As one of the three member cities that organized SRMPA, the City of Liberty had the right to appoint two Board members to the SRMPA Board. The City of Livingston had appointed its Mayor at the time, Ben Ogletree, and its City Manager, Sam Gordon. The City of Jasper had appointed its Mayor, R.C. Horn, and another individual, H.C. Dickerson, a City of Jasper council member, to the SRMPA Board. The City of Liberty then appointed Halstead, its Mayor, and Norman Dykes, its City Manager. In August of 1999, Halstead was elected by the SRMPA Board to serve as President of the SRMPA Board of Directors.

[4] R.C. Horn was formerly the Mayor of Jasper, and he served on the SRMPA Board of Directors as the representative for the City of Jasper. Horn also served as the Secretary of the SRMPA Board in 1999. Horn identified Exhibit 66 as the minutes from the January 26, 1999 SRMPA Board meeting. Horn's name appears on the minutes as Secretary. Horn testified that he recalled that Gillis made a presentation to the SRMPA Board in executive session on January 26, 1999, and that the presentation involved a proposal for SRMPA coming together with VPPA to supply power to some plants in Louisiana. According to Horn, SRMPA turned it down because they did not have all the information they needed. Horn also recalled that Gillis told the SRMPA Board that the proposal would be a good opportunity for SRMPA and the power association if they would take part in it.

from Gillis was sent to him shortly before the SRMPA Board meeting on March 27, 2001, and the email discussed SRMPA's earlier refusal of the Nisco Deal.

Halstead testified that during an SRMPA Board meeting in 2001 a Board member brought up a news article that discussed Jasper selling wholesale power outside of the SRMPA, and the Board member inquired as to the legality because of Jasper's previous connection with SRMPA. According to Halstead, the Board member requested an amendment to the agenda for the March 27, 2001 meeting so the Board could discuss the news article. Halstead testified that the minutes for the meeting reflect that he quoted Gillis and he explained to the Board that the contract in question was a wholesale activity independent of SRMPA with customers outside of Jasper. The minutes from the March 27, 2001 SRMPA Board meeting that were admitted into evidence provided the following:

> Sam Gordon addressed the Board regarding a story he became aware of in the news media in which the City of Jasper entered into a contract with Entergy for the purpose of wholesaling power. Mr. Gordon stated that he desired more information on this matter in light of the fact that the member cities of the SRMPA are required to buy all their power requirements from the Agency. Bruce Halstead quoted the Agency's general counsel as saying that the contract in question is a wholesaling activity independent of the Agency with customers outside of Jasper. Additional discussion indicated that participant cities' contracts with the Agency require them to buy all power requirements for their respective "captive" load from the Agency but that the contracts did not prohibit independent wholesale activities.

10

The contracts for the Nisco Deal had a term through April 30, 2008. Gillis testified that the monthly profit to the participants in the Nisco Deal was around $30,000 in 2001 and 2002, and that profit was split among Jasper, Obain, and VPPA. According to Gillis, due to the market driven nature of the Nisco Deal and gas prices, in 2003 there was no profit. Gillis explained that there had not been a minimum payment established and that in 2004 he called Hurstell to negotiate a guaranteed minimum payment. Ultimately, the minimum payment was negotiated to be a million dollars annually, which was divided equally among VPPA, Obain, and Jasper on a monthly basis.

Marilyn Sutton testified that in 1985 she was appointed City Secretary and Financial Officer for the City of Livingston, and that in 2005, she was appointed City Manager and Financial Officer for the City of Livingston. Sutton explained that she attended the SRMPA Board meeting on January 26, 1999. She testified that she had no memory of Gillis presenting anything about the Nisco Deal to the Board at that meeting or at any other time and that her notes from the meetings during that time frame do not reflect that Gillis presented the Nisco Deal to the Board. She recalled Gillis leading the discussion at the January 26, 1999 executive session in regards to the Board's best course of action because of Senate Bill 7's deregulation legislation, which was the main issue before the SRMPA Board at that time.

11

According to Sutton, she also attended a Board meeting in 2001 when Board member Gordon asked a question about Jasper buying power from Entergy to sell to VPPA. Sutton testified that Gordon had seen an article in the "Jasper Newsboy" wherein the City Council had discussed a wholesale power agreement Jasper had, and Gordon asked that it be placed on the agenda for discussion at the next Board meeting. According to Sutton, Gillis was not at the meeting and Bruce Halstead, who was president of the SRMPA Board at the time, explained that he had talked to general counsel and that the City of Jasper "was well within their limits" in entering into a confidential wholesale power agreement outside the scope of SRMPA and that SRMPA was not to know about it.

Ben Ogletree testified that he was appointed to the SRMPA Board in 1985 and was a Board representative and Mayor for the City of Livingston. He testified he served on the SRMPA Board from 1985 to 1991, and then again from 1996 until late 2011 or early 2012. Ogletree explained that, within a year of being appointed to the SRMPA Board, he met Gillis in Gillis's capacity as general counsel for SRMPA. According to Ogletree, he remembered a discussion during a 2001 Board meeting when Board member Sam Gordon raised an issue about how Jasper was buying power outside of the SRMPA arrangement, but Ogletree did not recall at any time Gillis presenting to the Board the Nisco Deal or a proposal for SRMPA to buy power

12

from Entergy and sell it to VPPA for its use in serving the IP loads near Lake Charles. Ogletree testified that Halstead, after talking to Gillis, explained to the Board that it was permissible for Jasper to buy power outside the SRMPA agreement, but that no details could be disclosed due to confidentiality agreements. According to Ogletree he was not aware that the arrangement inquired about by Gordon in 2001 was called the "Nisco Deal" until the discussion and contract negotiations for the Cambridge Project, and it concerned him that he could never get details about the arrangement.

David Riggins testified by video deposition regarding his tenure as a Board member of Vinton Public Power Authority (VPPA). From 1997 to 2001, as a Vinton city councilmember, Riggins served on the VPPA Board. From 2001 to 2006, as Mayor of Vinton, he continued to serve on the VPPA Board. He testified that it was his understanding that initially SRMPA was first approached to be part of the power project with VPPA, but according to VPPA representatives that attended the meeting "sometime" in January of 1999, SRMPA "did not see the value in it and refused at that time because they didn't see that there was enough sufficient profit to participate in it." After that, VPPA decided to work with the City of Jasper to try and put the transaction together. From the onset, Riggins understood that Gillis would be compensated one-third of the profit. According to Riggins, SRMPA did not feel the

13

chances of success were "sufficient, but Jasper was willing to participate and that the chances, based off of what Entergy had first said, was somewhere below 50 percent." Riggins recalled that the project started off well but then there was a time it was "mothballed" because another VPPA member, Donny Dupre,[5] had a problem with Gillis's receipt of development fees. Later, after Riggins became Mayor of Vinton in 2001, he reached out to Gillis and asked if they could move forward with the project and get the Nisco Deal back on track. According to Riggins, eventually the Nisco Deal was back on track and was profitable for Vinton. Riggins agreed that he had described his understanding of Obain Associates Limited as being Gillis's "business development entity distinct from [Gillis's'] lawyering[.]" Riggins also agreed he had no first-hand knowledge of the basis for Dupre telling him SRMPA had declined to move forward on the Nisco Deal, but he recalled that he interpreted from what Dupre conveyed to him that it was because SRMPA "didn't feel it was profitable enough to move forward." At trial, counsel for SRMPA asked Riggins about Exhibit 249, which Riggins testified appeared to be a communication from Dupre to Gillis, dated sometime on or after April 20, 2000, and it appeared to be in response to Gillis's April 20, 2000 email to Dupre. Riggins testified he did not recall ever seeing the document prior to trial. Riggins agreed that in the communication

---

[5] According to Riggins, Dupre is deceased.

14

Dupre purportedly states (1) he wants Vinton's share of the profits to be equal to the three Texas cities that make up SRMPA, (2) that Dupre states "[t]he last figure you told me [for the deal] was about 24 million for Vinton's part[,]" and (3) that Dupre states in the communication that VPPA should fire its lawyers. Riggins maintained that he did not know what was going on between Gillis and Dupre back in April of 2000 "other than [what] Mr. Dupre report[ed] back to us."

Evidence Regarding the Cambridge Project

Paul Wellenius, SRMPA's expert on the electrical power business and electrical transactions, testified that as the Cambridge Project was being discussed and developed, the Nisco Deal was extended to allow for the development of the Cambridge Project as a replacement concept. As the Nisco Deal's ending term approached, the Cambridge Project became operational in December 2011. Gillis testified that he created the Cambridge Project as an expansion of the Nisco Deal and that the Cambridge Project would "wrap around" or "encapsulate" the Nisco Deal. Gillis explained that Jasper and Vinton had already benefitted from the Nisco Deal but he wanted to bring SRMPA into the Cambridge Project so that he could get Livingston and Liberty "out of the well they had gotten into not through their own fault[,]" and also so Livingston and Liberty could "share the wealth." According to

Gillis, the four cities had always worked well together and "together they were a formidable block."

Bruce Halstead testified that Gillis contacted him around 2008 or 2009, with an idea that Gillis thought of when Gillis was either a "guest lecturer" or "teaching a course" at the University of Cambridge.[6] Halstead also testified that Gillis brought the idea of the Cambridge Project to SRMPA. Halstead testified that he understood that Gillis would be getting compensation for his services in Nisco, and he understood that Gillis's compensation in the Cambridge Project was in the form of a "reassignment fee." According to Halstead, he was told that Gillis would be paid a fee, but Gillis never discussed that Gillis was being paid part of the $3 million. Halstead testified that he recalled the "reassignment fee" being part of the modeling that SRMPA received from their consulting engineer, Doug Phethean, on the Cambridge Project. Halstead agreed that SRMPA also had a financial adviser and other consultants such as Fulbright & Jaworski[7] and Finken who worked for SRMPA

---

[6] Gillis testified that he was a "visiting fellow" at the University of Cambridge for two years while he also worked on a book that was published.

[7] According to Halstead, SRMPA had to stay in contact with the Texas Public Utilities Commission and they made trips to Washington, D.C. for meetings and discussions regarding federal hydropower issues and other federal regulation, as well as had bond refunding going on at the time. Gillis went with them on the trips as SRMPA's "general counsel." SRMPA also had a lobbyist, and Fulbright & Jaworski was its bond counsel and tax counsel. Halstead testified that SRMPA had to have

on the Cambridge Project. Halstead testified that the modeling for the Cambridge Project showed the "bottom line to [SRMPA]" would be profitable.

> Q. Was this Cambridge Project, was this something that you wanted to see done as president of SRMPA?
>
> A. When we were provided the modeling and the forecasting, most definitely wanted to move ahead with the project. The bottom line to the Agency was estimated on a monthly basis revenues anywhere from 400 to $450,000 a month; and because of the Cambridge concept and what would have to be in place, we would have to enter into a Supplemental Requirements Power Supply Agreement or an S-RPSA. Our RPSA would end in 2021. This deal would extend that delivered power through 2035.
>
> Q. And was that a benefit to SRMPA?
>
> A. Huge benefit. Look at the -- if they met the modeling -- and it was a conservative model -- if we met the model, [$]400,000 a month for 12 months through 2035 is a significant amount of money. That money coming through the Agency would then be distributed to the member cities. I wasn't mayor at the time and I was still on the board, but being a citizen of Liberty, I would want Liberty's share of those revenues to come back to the city for lowering rates, stabilizing rates, infrastructure, and things of that nature.

Halstead was aware that there would need to be concessions from Jasper and VPPA and he was also made aware of the Jasper/VPPA Settlement Trust.

---

the Fulbright & Jaworski attorneys review the Cambridge Deal to make sure there was no negative impact on the SRMPA bonds or bond rating, but he was not sure if they also reviewed it for tax consequences. He testified that the Fulbright & Jaworski attorneys did review the Cambridge contracts for SRMPA.

Q. Did you know at the time the Cambridge Project was being developed what concessions would be needed to deal with whatever Jasper and VPPA's interests may have been from back earlier?

A. Other than those line items that were delineated in the modeling, the reassignment fee, and then also us, as Sam Rayburn, trying to realize the value of the asset of the headroom moving forward.

. . . .

Q. That's the extent of your awareness of whatever it was that was the need to be addressed with respect to back when in terms of Jasper and VPPA; right?

A. I believe closer to the signing of the Cambridge Deal that I was -- signed off on a document dealing with the Jasper/VPPA Settlement Trust and how that was to operate within Cambridge.

Halstead stated that during the time Gillis represented SRMPA he knew that Gillis also represented VPPA. Halstead agreed that after the Cambridge Project documents were signed, SRMPA decided to terminate Gillis as its general counsel.

Q. Now, how long after SRMPA signed the documents to enter into the Cambridge Project did it let Mr. Gillis go?

A. Cambridge Deal began December 2011; and Mr. Gillis was discharged midway through 2012, I believe.

. . . .

Q. Why did the SRMPA board terminate Mr. Gillis?

A. Personalities on the board. I don't believe, though, there were any bases logically for his termination given the length of service and what he had done. And I was a staunch supporter of his and actually voted to

18

retain him, and I thought it was a matter of some of the board members' personalities getting in the way.

Q. But those personalities did not get in the way until after they signed the Cambridge documents; correct?

A. It arose at a later date, yes, ma'am.

Gillis testified that he initially presented the idea of bringing SRMPA into the Cambridge Project to VPPA to persuade VPPA to invite SRMPA into the deal even though SRMPA was not a necessary party. According to Gillis, after VPPA accepted the idea, he contacted Halstead with SRMPA and explained that with the Cambridge Project, the value of the Nisco Deal would continue, and the fee Gillis was receiving from the Nisco Deal would also continue. According to Gillis, the reassignment fee was capped at $3 million and it was to be retained by the Trust out of the VPPA retail rate revenues and would then be paid one-third to VPPA, one-third to Jasper for forgoing the Nisco Deal that was profitable for Jasper, and the remaining one-third to Gillis as his fee. Gillis explained that the Nisco Deal still exists through suspension agreements that continue into 2036.

Sutton testified that she knew that Jasper and Vinton received money from the Cambridge Project. However, she did not become aware until around the time of the filing of the lawsuit that Gillis's company, Obain, received part of the reassignment fee paid in connection with the Cambridge Project.

19

Edward Mintz testified that he practiced law full-time until he was hired in 2012 by SRMPA as its executive director, a position he still held at the time of trial. According to Mintz, from 1999 until Gillis's tenure as counsel for SRMPA ended in 2012, SRMPA looked to Gillis to give legal advice as general counsel, to generate business opportunities and broker deals for SRMPA, and to represent SRMPA before the regulatory agencies. Mintz testified that SRMPA regularly paid Gillis's hourly rate-based fees and paid the invoices from the Gillis Firm for Gillis's work on the Cambridge Project. Mintz explained that the contracts for the Cambridge Project run through the year 2036, and SRMPA will continue benefitting from the Cambridge Project.

According to Mintz, SRMPA agreed to pay the $3 million a year reassignment fee through 2036 to the Trust, but Mintz testified that Gillis led him to believe that the only beneficiaries of the Trust were the City of Jasper and VPPA, who were being paid for giving up the Nisco Deal. Mintz agreed that Gillis never informed SRMPA that Gillis and Gillis's wife (through Obain) were receiving one-third of the fee from the Trust. Mintz testified that after Gillis's representation of SRMPA ended in June of 2012, Mintz discovered that a portion of the amount being paid by the Trust to Obain was then going to Gillis. According to Mintz, the Cambridge Project has been the most profitable project in the history of SRMPA and, in the four-and-

a-half years prior to the trial, SRMPA had profits of approximately $70 million as a result of its involvement in the Cambridge Project.

The Trial Court's Judgment

The trial court entered a final judgment based upon the verdict of the jury and after considering post-trial motions from the parties. In the final judgment the trial court (1) awarded SRMPA no damages from Defendants as to the Nisco Deal because the jury found that SRMPA should have discovered Gillis's breach of fiduciary duty in connection with the Nisco Deal by March 27, 2001, and therefore the statute of limitations had run; (2) found Gillis violated his fiduciary duty to SRMPA and awarded $1,799,059 in past damages, plus post-judgment interest, to SRMPA from Gillis and Obain in connection with the Cambridge Project; (3) denied SRMPA's claims against Gillis, Borchardt & Barthel LLP and rendered a take-nothing judgment as to those claims; (4) denied SRMPA's claims relating to the upgrade of the Entergy transmission system and rendered a take-nothing judgment as to those claims; (5) denied SRMPA's claim for exemplary damages against Gillis and rendered a take-nothing judgment as to that claim; (6) denied SRMPA's claims for equitable relief against Defendants and rendered a take-nothing judgment in favor of Defendants as to those claims; and (7) denied SRMPA's claims against the Trust and rendered a take-nothing judgment as to those claims. As to the Trust's

21

bifurcated indemnity counterclaim, the trial court denied the Trust's indemnification claim but ordered SRMPA to pay all costs of court incurred by the Trust in the matter.

Appellate Issues

SRMPA presents five issues on appeal. In its first issue, SRMPA argues that the trial court erred in denying SRMPA's claims for equitable relief because Gillis "breached his fiduciary duty regarding both the Nisco Deal and the Cambridge Project," and that the trial court should have required Gillis to "disgorge the monies he has already received from the Nisco Deal and the Cambridge Project" and should have imposed a constructive trust on the funds Gillis is scheduled to continue receiving under the Cambridge Project. In issue two, SRMPA argues that, as to the Nisco Deal, the trial court erred in failing to disregard the jury's answer on limitations as immaterial and that, as a matter of law, SRMPA should recover the $5 million in damages that the jury found SRMPA suffered from Gillis's breach of fiduciary duty because the award is not barred by limitations. In its third issue, SRMPA challenges the amount of the jury's award relating to Gillis's breach of fiduciary duty in connection with the Cambridge Project. SRMPA alleges that "[b]ased on the conclusive, undisputed evidence, the amount awarded as past damages to SRMPA should now be rendered in the total amount of $4,350,074.90."

22

In its fourth issue, SRMPA asserts that the Gillis Firm should be jointly and severally liable with Gillis (and Obain as his alter ego) for the full damages awarded on the basis of respondeat superior. In issue five, SRMPA argues the trial court erred in failing to enjoin Gillis and the Gillis Firm from representing the Trust adversely to SRMPA on matters related to Gillis's past representation of SRMPA.

Cross-Appellants Gillis and Obain ask this Court to find there was no evidence or legally insufficient evidence to support submission of certain jury questions, and that the trial court should have granted Gillis's and Obain's motion for directed verdict or motion for judgment notwithstanding the verdict. According to Cross-Appellants Gillis and Obain, Gillis owed no fiduciary duty to SRMPA in the Nisco Deal because SRMPA chose not to participate in the Nisco Deal. Obain and Gillis also contend that as to the Cambridge Project, SRMPA had knowledge of Gillis's fee in the Cambridge Project, and SRMPA's damages are foreclosed because it signed the Cambridge Project documents with knowledge that Gillis, through Obain, would receive a fee from Jasper and VPPA, and after obtaining such knowledge, SRMPA continued to accept the benefits of the Cambridge Project so they should be estopped from any recovery.

On cross appeal, the Trust argues that it is entitled to entry of judgment against SRMPA on the Trust's indemnity counterclaim because "the unambiguous language

23

of the parties' agreement provides that [SRMPA] shall hold the Trust harmless from the exact claims brought against it below."

Analysis

Denial of Equitable Relief

In SRMPA's first issue, it argues the trial court should have granted equitable remedies "to prevent the lawyer defendant and his alter ego from benefit[t]ing personally, and retaining ill-gotten gains, from their breaches of fiduciary duty and self-dealing, by keeping $1 million per year for the next twenty years." SMRPA specifically argues that the equitable remedies of disgorgement and constructive trust are necessary here, regardless of whether SRMPA suffered or benefitted from Gillis's alleged self-dealing.

We review a trial court's decision granting or denying equitable relief for an abuse of discretion. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 428-29 (Tex. 2008). A trial court must balance the equities involved in a case seeking equitable relief. *See In re Gamble*, 71 S.W.3d 313, 317 (Tex. 2002) (orig. proceeding). We will not disturb a trial court's ruling on a claim seeking equitable relief unless it is arbitrary, unreasonable, and unsupported by guiding rules and principles. *See Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

24

A jury does not determine the expediency, necessity, or propriety of equitable relief such as disgorgement or constructive trust. *See Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999). Whether "a constructive trust should be imposed must be determined by a court based on the equity of the circumstances." *Id.* The scope and application of equitable relief such as a constructive trust "'within some limitations, is generally left to the discretion of the court imposing' it." *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied) (quoting *Wheeler v. Blacklands Product. Credit Ass'n*, 627 S.W.2d 846, 849 (Tex. App.—Fort Worth 1982, no writ)).

At the hearing on SRMPA's Motion to Modify, Correct or Reform Final Judgment,[8] the trial court stated the following:

> [F]or the record, I have literally reviewed this trial back and forth, over and over again, looked at various documents when I thought I needed help to do so, because I still have all that stuff from the summary judgment. And not -- so that it's clear, I did not include anything that wasn't testified about in the trial.
>
> Because I do think that it is the Court's duty to look closely -- and I want to point out very simply that [Plaintiff's counsel] made a statement in a previous argument when we signed the original judgment back in August, I believe it was, that the jury got this wrong on certain issues. And, so, I wanted to, in my mind, see if I thought that was true, looking at it from an equitable situation, not from necessarily the answers to the questions.

[8] We review the denial of a motion to modify, correct, or reform a judgment for an abuse of discretion. *See Wagner v. Edlund*, 229 S.W.3d 870, 879 (Tex. App.—Dallas 2007, pet. denied).

But in order to do that, I've gone back through the Charge; and I even considered how we put the Charge together. And I will say, for the record, the Charge was basically the Charge the Court wanted with the input, obviously, by counsel; and I would think the Charge was, more or less, what the plaintiff wanted, as well -- objections aside, of course -- and was geared in a way to get to the point of whether Mr. Gillis violated a fiduciary duty and, if he did, when did it become known and so forth with all the questions that we asked. So, in my overall review, I took the Charge and acted as a juror, as well, to see if I thought they had gotten it wrong.

And I've come to conclusions, and I've come to what I think are going to be my rulings in this case.

. . . .

. . . [I]f I'm going to create a constructive trust, I have to go forward and find out, one, in my mind, if the jury did get it right or close enough to right or reasonably right or do I find that, based on [Gillis's] conduct, that he should be punished more than the jury indicated? . . .

But what does "equity" mean? It means what is fair. You know, if someone does a wrong, what is fair? What is their fair treatment? And we are talking about money here, period. And vice versa, what is the justice of this case?

So, in reviewing all the facts and in reviewing all the things that I think I had the duty to do, which I am telling you, whether I'm right or wrong, I have looked at for hours in this case, I can see where the jury, without just that one bit of evidence that's been argued before me about the profits of [SRMPA], I can see where the jury imposed the 1.79 -- or whatever it was -- million dollars' damage against Mr. Gillis because he was in violation of his fiduciary duties by not disclosing he was getting a fee just on that one basis alone in the -- in the Cambridge [Project].

However, if I recall, . . .

[Bruce Halstead] got a memo -- and it wasn't on the date that the jury found -- but he got a memo from Gillis before that indicating that this deal was in place and next time I come to you with a wacky deal . . . I believe he was still the president of [SRMPA] at the time that they called off the deal and also still the president at the time they committed to the deal. And he knew he was getting a fee for Nisco,

26

which he knew was a partnership between Jasper and VPPA and however Entergy was involved in that deal.

But does that knowledge carry over? And would Gillis have had any damage had he simply said to [SRMPA], "Yes, I'm getting a fee; and it's whatever it is. I am getting a fee, and that's part of the Trust that I've set up. I'm going to get paid for these activities"? I don't know that we would even be here at this point in time. I mean, [SRMPA] would have either gone along with it or not and there would be a Cambridge [Project] or there wouldn't[.]

So, . . . I think the jury got it pretty close to right. And I think they awarded damages for his violation of fiduciary duty up to the date of this trial, when it was finally known, by virtue of their verdict, and the Nisco Deal was ruled on fairly, in my mind, legally, as well as factually.

And, so, I am not going to set up a constructive trust in this case, and the jury judgment that I signed before is the one that will remain in place at this time.

The trial court signed an order denying SRMPA's Motion to Modify, Correct or Reform.

SRMPA cites to *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214 (Tex. 2017), in support of its argument that the trial court erred in failing to grant equitable relief. According to SRMPA, *Parker* "stands in a long line of precedents that, without regard to whether a fiduciary such as Gillis has caused his client damage, the fiduciary must not be permitted to benefit from the transactions affected by his breach of fiduciary duty."

In *Parker*, the First United Pentecostal Church of Beaumont sued The Lamb Law Firm, P.C., Kip Lamb, and Leigh Parker, for theft, embezzlement,

27

misapplication of funds by a fiduciary, breach of fiduciary duty, fraud, legal malpractice, conspiracy, and "other wrongful conduct[,]" after the law firm spent over a million dollars that the church had entrusted for safekeeping to the law firm. 514 S.W.3d at 217-18. Parker claimed that he was a contract attorney with the Lamb Law Firm and that he did not find out about the theft until 2010, but the church alleged that Parker was associated with or worked for the firm, was part of a joint venture with Lamb and the firm, that Parker knowingly participated in Lamb's breach of fiduciary duty, made intentional misrepresentations to the church to cover up the fact that the money was gone, and he was jointly and severally liable for the church's damages. *Id.* In his no-evidence motion for summary judgment, Parker argued that the church had not produced any evidence of causation between his actions and the church's damages. *Id.* at 218. In support of his traditional motion for summary judgment, Parker attached his affidavit in which he averred he was a contract attorney for the firm, that he had no knowledge of Lamb's scheme until the summer of 2010, and that he did not control or receive any of the church's money. *Id.* He also attached a copy of Lamb's reply to a criminal presentencing investigation in which Lamb admitted he used the church's funds. *Id.* The trial court granted Parker's motion for summary judgment without specifying the reasons and this Court, in a split decision, affirmed the trial court's ruling. *Id.* at 219 (citing 520

28

S.W.3d 53 (Tex. App.—Beaumont 2015)). In appealing this Court's decision affirming the granting of summary judgment in favor of Parker, the church argued, in relevant part, that it did not need to provide evidence of causation in order to survive summary judgment on its breach of fiduciary duty claim. *Id.* Parker argued the church failed to preserve error, and even if error was preserved, evidence of proximate cause of the church's damages was necessary to survive summary judgment and the church did not present such evidence. *Id.*

The Texas Supreme Court held that this Court erred by determining that summary judgment for Parker was proper on the breach of fiduciary duty claim but the church was entitled to proceed with its claim for equitable relief. *Id.* at 221-22. In so ruling, the Texas Supreme Court noted that, although Parker argued he did not profit from his relationship with the church and the church failed to allege a factual basis for fee forfeiture or disgorgement as to him, he did not address the equitable remedies in his motion for summary judgment. *Id.* at 222.

Unlike *Parker*, the trial court in this case ruled upon the request for equitable relief after presiding over a jury trial and after considering all of the evidence and equities. A trial court has broad discretion in balancing the equities involved in a case seeking equitable relief. *See In re Gamble*, 71 S.W.3d at 317; *Craddock v. Sunshine Bus Lines, Inc.*, 133 S.W.2d 124, 126 (1939). In the present case, the record

29

reflects that the trial judge considered whether equitable remedies were fair and just on the facts, and the trial judge stated that he spent hours reviewing evidence and pleadings related to that issue before deciding to deny equitable relief. After reviewing the appellate record and facts in this case, we cannot say the trial court acted arbitrarily or unreasonably or that the trial court's decision was unsupported by guiding rules and principles. According to the record, the trial court weighed the equities based upon the evidence presented at trial. We conclude the trial court did not abuse its discretion in denying SRMPA's request for equitable relief. *See Sheppard*, 282 S.W.3d at 428-29; *Cire*, 134 S.W.3d at 838; *Downer*, 701 S.W.2d at 241-42. We overrule SRMPA's first issue.

Limitations Regarding the Nisco Deal

SRMPA argues in its second appellate issue that the trial court erred in "sustain[ing] the Defendants' limitations defense and disregard[ing] the jury's finding that Gillis'[s] breach of fiduciary duty regarding the Nisco Deal damaged SRMPA in the amount of $5 million."

Jury question five asked "Did Gillis fraudulently conceal his breach of fiduciary duty, in connection with the Nisco Deal, from SRMPA?"[9] The jury

---

[9] The question contained a definition for fraudulent concealment, and provided that

30

answered "yes[.]" Jury question six asked "On what date did SRMPA obtain sufficient knowledge that would have required a reasonably prudent person to make inquiry that, if pursued, would lead to discovery of Gillis'[s] breach of fiduciary duty in connection with the Nisco deal?" The jury answered "March 27, 2001[.]" SRMPA requested an additional instruction for question six that was refused by the trial court. The instruction SRMPA requested stated as follows:

> In answering this question, you are instructed that, as a fiduciary, an attorney is obligated to render a full and fair disclosure of facts material to the client's representation. Therefore, facts which might ordinarily require a person to make inquiry may not raise suspicion where a fiduciary relationship is involved.

According to SRMPA, the evidence conclusively established fraudulent concealment, and the jury's answer on the limitations issue is inadequate to override the finding on fraudulent concealment because the limitations question was "infirm[]" and "without a proper instruction." SRMPA also argues that the evidence did not support the jury's answer on the "discovery" question if the issue had been

---

Fraudulent concealment occurs when:
1. the defendant has actual knowledge that he committed a wrong;
2. the defendant concealed the wrong by making a misrepresentation or by remaining silent when he had a duty to speak;
3. the defendant had a fixed purpose to conceal the wrong; and
4. the plaintiff reasonably relied on the misrepresentation or silence.

31

properly framed and that the jury's answer to the "discovery" question should be disregarded as immaterial.

The statute of limitations for a claim of breach of fiduciary duty is four years. Tex. Civ. Prac. & Rem. Code § 16.004(a)(5) (West 2002). SRMPA contends that the doctrine of fraudulent concealment tolls limitations "because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996).

A trial court must submit in its charge to the jury all questions, instructions, and definitions that are raised by the pleadings and the evidence. *See* Tex. R. Civ. P. 278; *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663-64 (Tex. 1999); *E.I. DuPont de Nemours & Co. v. Roye*, 447 S.W.3d 48, 56 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd). The parties have the right to be judged by a jury properly instructed in the law. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000). The goal, therefore, is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *Roye*, 447 S.W.3d at 56. To achieve this goal, trial courts enjoy broad discretion so long as the charge is legally correct. *Id.* We review a trial court's decision to refuse a particular instruction under an abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012); *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). Explanatory instructions should be

32

submitted when, in the sole discretion of the trial court, they will help the jurors understand the meaning and effect of the law and the presumptions the law creates. *Pitts v. Sabine River Auth. of Tex.*, 107 S.W.3d 811, 819 (Tex. App.—Texarkana 2003, pet. denied). The court should not burden the jury with surplus instructions. *Acord v. Gen. Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984). Consequently, every correct statement of the law does not necessarily belong in the jury charge. *Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 671 (Tex. App.—Houston [1st Dist.] 1996, no writ). When a trial court refuses to submit a requested instruction, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000). A trial court's error in refusing an instruction is reversible only if it "probably caused the rendition of an improper judgment." *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002); *see also* Tex. R. App. P. 44.1(a) (addressing reversible error in civil cases).

Tendering a proposed jury question or instruction will not suffice to preserve error when a proper objection has not been made to the question or instruction submitted. *See Kirkpatrick v. Mem'l Hosp. of Garland*, 862 S.W.2d 762, 769 (Tex. App.—Dallas 1993, writ denied); *see also Carr v. Weiss*, 984 S.W.2d 753, 766 (Tex. App.—Amarillo 1999, pet. denied); *Boorhem-Fields, Inc. v. Burlington N. R.R. Co.*,

33

884 S.W.2d 530, 535 (Tex. App.—Texarkana 1994, no writ); *Schutz v. S. Union Gas Co.*, 617 S.W.2d 299, 302 (Tex. Civ. App.—Tyler 1981, no writ). "A request for submission is required to preserve the right to complain of a trial court's failure to *submit* a question; whereas, an objection is required to preserve a complaint as to a *defective* question." *Hartnett v. Hampton Inns, Inc.*, 870 S.W.2d 162, 166 (Tex. App.—San Antonio 1993, writ denied) (citing Tex. R. Civ. P. 274, 278). Appellant only objected that question six was incomplete, and not that it was improper. And, Appellant did not explain to the trial court why the requested instruction was reasonably necessary in order for the jury to render a proper verdict. *See* Tex. R. Civ. P. 274.

In *Carr,* the court explained:

Objections to the charge and requests for submission of issues are not alternatively permissible methods for complaining of the charge. Because a request for another charge is not a substitute for an objection, in the absence of a specific objection to the submitted question and instruction, the tender of a correct question is not sufficient to preserve error, even if a defectively worded special instruction is contained in the court's proposed charge. Moreover, it is the rule that if a trial court's charge fairly and fully presents all controlling questions to the jury, it is not error to refuse to submit additional issues or instructions which are mere shades or variations of the questions already submitted.

984 S.W.2d at 766 (citations omitted). Appellant's objection at trial did not specifically assert that the question six was improper. *See* Tex. R. Civ. P. 274; *Garza v. Southland Corp.*, 836 S.W.2d 214, 218 (Tex. App.—Houston [14th Dist.] 1992,

34

no writ) ("A mere request to submit a different instruction or issue [other] than that proposed by the court does not sufficiently point out the specific objectionable matter and will not be considered an 'objection' for the purposes of Rule 274."). Generally, a request for a different instruction is not a substitute for an objection and does not preserve error. *See Hernandez v. Montgomery Ward & Co.,* 652 S.W.2d 923, 925 (Tex. 1983), *overruled on other grounds by Acord v. Gen. Motors Corp.,* 669 S.W.2d 111, 114 (Tex. 1984); *but see State Dep't of Highways & Pub. Transp.,* 838 S.W.2d 235, 240-41 (Tex. 1992) (concluding a request can serve as an objection for preservation purposes if the trial court is made aware of the complaint and issues a ruling). Appellant's request for an instruction and the generic "incomplete" objection was insufficient to preserve the error Appellant asserts on appeal. Therefore, Appellant waived any complaint regarding the court's rejection of the instruction.

Nevertheless, even assuming SRMPA preserved the argument it makes in its second issue, we cannot say that the trial court abused its discretion in rejecting the instruction requested by SRMPA. A jury instruction is proper when it assists the jury, accurately states the law, and is supported by the pleadings and evidence. *McIntyre v. Comm'n for Lawyer Discipline*, 247 S.W.3d 434, 446 (Tex. App.— Dallas 2008, pet. denied). However, "[a]n incorrect jury instruction is grounds for

reversal only if it likely caused the rendition of an improper verdict." *Id.* at 444 (citing Tex. R. App. P. 44.1(a) and *Williams,* 85 S.W.3d at 166). When a trial court denies the request to include an instruction, the question on appeal is whether the proposed instruction was reasonably necessary to enable the jury to render a proper verdict. *Id.* at 446.

SRMPA argues on appeal that it cited to *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988) and *Courseview, Inc. v. Phillips Petroleum Co.*, 312 S.W.2d 197, 205 (Tex. 1957) in the trial court in support of its requested instruction. However, the cases cited by SRMPA do not support its argument on appeal that the absence of SRMPA's requested instruction prevented the jury from "deal[ing] intelligently with the questions submitted." We note that included within the instructions on jury question one, the trial court instructed the jury that in order to prove he complied with his duty, Gillis "must show— . . . 3. Gillis acted in utmost good faith and exercised the most scrupulous honesty toward SRMPA; and . . . 5. [that] Gillis fully and fairly disclosed all important information to SRMPA concerning the transactions." We further note that the party that is seeking to avoid limitations has the burden to plead, prove, and obtain favorable jury findings on the issue of discovery as a matter of avoidance of limitations. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988).

The Texas Supreme Court has recognized two doctrines that may apply to extend the running of a statute of limitations: fraudulent concealment and the discovery rule. *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927-30 (Tex. 2011). Fraudulent concealment is a fact-specific equitable doctrine that may toll the statute of limitations until the fraud is discovered or could have been discovered with reasonable diligence. *Id.* at 927; *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1983). The discovery rule is a limited exception, and it may also defer the accrual date of a cause of action until an injury "was or could have reasonably been discovered." *Ross*, 356 S.W.3d at 929-30. The concepts require the injured party to exercise "reasonable diligence" or act "reasonably" with respect to the discovery of the alleged wrongdoing. *Id.* at 927-30.

We cannot say that the trial court abused its discretion in refusing to submit the instruction requested by SRMPA. The trial court correctly noted that jury question six asked the jury to find the date on which SRMPA obtained sufficient knowledge that would have required a reasonable and prudent person to make an inquiry that, if pursued, would have lead SRMPA to discover Gillis's breach of fiduciary duty in connection with the Nisco Deal. We conclude that the additional instruction proposed by SRMPA was not "reasonably necessary to enable the jury to render a proper verdict." *See Mandlbauer*, 34 S.W.3d at 912. Accordingly, the

trial court did not abuse its discretion when it refused to submit the instruction to the jury. Furthermore, we cannot say that the trial court's refusal of the requested instruction probably caused the rendition of an improper judgment. *Dew*, 208 S.W.3d at 456; *see also* Tex. R. App. P. 44.1(a). Therefore, the alleged error, if any, was harmless.

Because we have already determined (1) that the trial court did not abuse its discretion in refusing to submit the requested instruction and (2) the trial court did not abuse its discretion in denying SRMPA equitable relief, we need not address SRMPA's argument that the jury's "limitations" answer to jury question 6 should be disregarded because Gillis's limitations defense has no application to an equitable claim or that the limitations finding is immaterial "in an equitable context." We overrule SRMPA's second issue.

Damages Awarded Relating to the Cambridge Project

In issue three, SRMPA argues that there is "conclusive evidence" in the record of the actual amounts the Trust distributed to Obain from the Cambridge Project prior to trial, "but the trial court failed to use that evidence to award an accurate amount of SRMPA's past damages regarding the Cambridge Project." According to SRMPA, the jury awarded SRMPA $1,799,059 in damages regarding the Cambridge Project, which was the exact amount presented in an exhibit by SRMPA's damage

38

expert as "Cambridge Deal (Past [Damages])" attributable to "Gillis (Obain Associates Limited)[.]" SRMPA contends, however, that the expert clarified in his testimony at trial that the figure in his exhibit only represented past damages through 2013 and it did not include damages from 2013 to 2016 (the date of the trial) and that the expert included the damages amount from 2014 and up until trial in his calculations for the "Cambridge Deal (Future [Damages])" attributable to "Gillis (Obain Associates Limited)" on an exhibit. According to SRMPA, the jury "apparently us[ed] the chart" and "overlook[ed] the undisputed testimony" and other exhibits establishing that an additional $2,551,015 should have been included with the $1,799,059 awarded to arrive at the "full" and "correct amount" of past damages against Gillis and Obain.

Under Texas law, "whether to award damages and how much is uniquely within the factfinder's discretion." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003). The evidence need not correspond to the precise amount found by the jury. *See Pleasant v. Bradford*, 260 S.W.3d 546, 559 (Tex. App.—Austin 2008, pet. denied). A jury is "not tied to awarding damages exactly as requested by the injured party[,]" and it does not have to rely solely on an expert's opinion in calculating damages. *Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 606 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *see also Main Bank &*

39

*Trust v. York*, 498 S.W.2d 953, 957 (Tex. App.—San Antonio 1973, writ ref'd n.r.e.) (a jury may disbelieve an expert and "the factfinder is not cut off from exercising considerable personal judgment about how far such opinions are to be relied on[]"). When the evidence at the trial supports a range of damages, "an award within that range is an appropriate exercise of the jury's discretion, and a reviewing court is not permitted to speculate on how the jury actually arrived at its award." *Drury Sw., Inc. v. Louie Ledeaux #1, Inc.*, 350 S.W.3d 287, 292 (Tex. App.—San Antonio 2011, pet. denied). The jury could have disbelieved the expert testimony regarding the future damages. In fact, the jury awarded SRMPA nothing for future damages. However, SRMPA does not complain on appeal about the jury's decision not to award SRMPA any future damages in relation to the Cambridge Project. We conclude that the evidence is sufficient to support the jury's award and we may not substitute our judgment for that of the factfinder. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005) (appellate court may not substitute its judgment for that of the factfinder so long as the evidence falls within the zone of reasonable disagreement). We overrule SRMPA's third issue.

Respondeat Superior

In SRMPA's fourth issue it argues the Gillis Firm should be jointly and severally liable with Gillis (and Obain as his alter ego) for the full damages awarded

to SRMPA on the basis of respondeat superior. According to SRMPA, the trial court erred in limiting the liability of damages to Gillis and Obain and in not also imposing that liability on the Gillis Firm.

On appeal, the Gillis Defendants argue that SRMPA presented this argument for the first time on appeal. The Gillis Defendants further argue that SRMPA did not plead respondeat superior against the Gillis Firm and that SRMPA did not submit a respondeat superior question to the jury. In their Reply Brief, SRMPA argues that it presented the argument to the trial court in its post-verdict Motion to Modify, Correct or Reform Final Judgment, when SRMPA made the statement in one sentence in its post-verdict Reply Brief that "'all of the foregoing amounts of damages should be awarded against Gillis, Borchardt & Barthel LLP on the basis of vicarious/respondeat superior liability.'"

SRMPA does not cite to any other pleading or part of the appellate record to support its contention that the trial court was made aware of its argument regarding respondeat superior. In its Motion to Modify, Correct or Reform Final Judgment, although SRMPA asked the trial court to award the damages against the Gillis law Firm, Gillis, and Obain on the basis of "vicarious/respondeat superior liability[,]" SRMPA did not provide any legal authority to the trial court to support its argument. SRMPA bore the burden of proof on this issue. *See 20801, Inc. v. Parker*, 249

41

S.W.3d 392, 397 n.6 (Tex. 2008) (plaintiff pleading respondeat superior bears the burden of proof). Furthermore, SRMPA does not cite to any other place in the record where it pleaded, proved, or secured a finding in support of its vicarious liability claim against the Gillis Firm. Accordingly, we cannot say that the trial court abused its discretion in refusing to modify the final judgment on this issue. *See Wagner v. Edlund*, 229 S.W.3d 870, 879 (Tex. App.—Dallas 2007, pet. denied) (appellate court reviews the denial of a motion to modify, correct, or reform a judgment for an abuse of discretion). Therefore, we overrule issue four.

<u>SRMPA's Request for a Permanent Injunction Against Gillis and the Gillis Firm</u>

In issue five, SRMPA argues that Gillis and the Gillis Firm should be permanently enjoined from representing VPPA because after SRMPA discharged Gillis and the Gillis Firm in 2012 he continued to represent VPPA "against SRMPA's interests on the same subject matter on which he had previously represented SRMPA." According to SRMPA, "[t]his is the only appropriate relief possible when a fiduciary violates his position of trust." SRMPA includes no citations to the appellate record on this issue. SRMPA did not secure a ruling on any request as to this "remedy[,]" and there was no jury question presented on this issue. As such, SRMPA has not preserved this issue for appeal, and there is nothing for

this Court to review.[10] *See* Tex. R. App. P. 33.1; 38.1(i). We overrule SRMPA's fifth issue.

Cross-Appeal by Gillis and Obain Regarding Sufficiency of the Evidence to Support Submission of Certain Jury Questions and Denial of Motion for Directed Verdict/Motion for Judgment JNOV

In their cross appeal, Gillis and Obain argue that Gillis is entitled to judgment on all issues regarding the Nisco Deal because SRMPA did not submit evidence or provide legally sufficient evidence that SRMPA ever engaged Gillis to pursue the Nisco Deal; that SRMPA failed to submit evidence or present legally sufficient evidence that the Nisco Deal was a business opportunity that SRMPA would have actually pursued, agreed upon, and implemented; that SRMPA failed to establish that Gillis concealed his relationship with Obain when the Cambridge Project agreements were being negotiated and executed; and that SRMPA failed to establish that it suffered actual damages or that Gillis's alleged concealment profited Gillis to the detriment of SRMPA. Gillis and Obain contend that SRMPA's request for a

---

[10] We also note that the only authority SRMPA cites in support of this argument is *Intermarque Automotive Products, Inc. v. Feldman*, 21 S.W.3d 544, 553 (Tex. App.—Texarkana 2000, no pet.). *Feldman* does not address the propriety of the grant of a permanent injunction against an attorney from representing another client. In *Feldman*, the court of appeals merely included a footnote wherein it generally discusses the remedy of fee forfeiture and references *Burrow v. Arce*, 997 S.W.2d 299 (Tex. 1999). *See Feldman*, 21 S.W.3d at 553 n.17 (quoting *Burrow*, 997 S.W.2d at 544).

constructive trust asks this Court to circumvent the Texas Utilities Code. Gillis and Obain assert that they are not asking this Court to reverse the jury's findings, but are asking this Court to hold that (1) there was no evidence or only legally insufficient evidence to support submission of certain jury questions, and (2) the trial court should have granted Gillis's and Obain's motion for directed verdict or motion for judgment notwithstanding the verdict.

We first address Gillis's and Obain's argument that the trial court erred in denying its motion for directed verdict on Gillis's and Obain's ratification defense. Gillis and Obain argued in their motion for directed verdict and in their cross appeal that SRMPA has ratified Gillis's and Obain's alleged wrongful receipt of the fee because SRMPA continues to participate in the Cambridge Project and retain its benefits. In denying the motion for directed verdict on ratification, the trial court stated the following:

> So, ratification, another interesting issue; but in reading the language put forth in the Charge submitted, proposed charge and instructions submitted, it practically calls for a jury nullification of some of the other issues in this. I don't think a party is, because they continue into a lucrative contract, can't carve out an alleged wrongdoing rather than just saying, okay, everybody's done at the expense and cost of people that aren't even parties to this lawsuit. So, although I find that an interesting issue, as well, I'm going to deny your Motion on ratification.

We review a trial court's decision on a motion for directed verdict under the same standard of review as a legal sufficiency, or no-evidence, challenge. *See*

44

*City of Keller*, 168 S.W.3d at 823; *Haynes & Boone, L.L.P. v. Chason*, 81 S.W.3d 307, 309 (Tex. App.—Tyler 2001, pet. denied) ("An appeal from the denial of a motion for directed verdict is . . . a challenge to the legal sufficiency of the evidence."). "[A] directed verdict is proper only if the evidence conclusively establishes the movant's right to judgment, negates the opponent's right to judgment, or is insufficient to raise a fact issue on a vital fact." *In re Estate of Longron*, 211 S.W.3d 434, 438 (Tex. App.—Beaumont 2006, pet. denied) (citing *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)).

Because ratification is an affirmative defense, the party raising the issue bears the burden to offer proof on each of the elements of the defense: (1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act. *Motel Enters., Inc. v. Nobani*, 784 S.W.2d 545, 547 (Tex. App.—Houston [1st Dist.] 1990, no pet.). Even assuming without deciding that a ratification defense applies in this context, Gillis and Obain failed to cite the trial court to evidence that would support each of the elements of a ratification defense, and we agree with the trial court that granting the directed verdict on ratification could potentially nullify other jury answers. We overrule Gillis's and Obain's cross appeal regarding ratification. Because we have already overruled SRMPA's issues regarding equitable relief, limitations and damages,

45

Gillis's and Obain's other issues on cross appeal are moot. Therefore, we overrule all of Gillis's and Obain's issues on cross appeal.

The Trust's Indemnity Counterclaim

In its cross appeal, the Trust asserts that it does not challenge the portion of the judgment that SRMPA take nothing against the Trust but the Trust argues that it is entitled to entry of judgment against SRMPA on the Trust's indemnity counterclaim because "the unambiguous language of the parties' agreement provides that [SRMPA] shall hold the Trust harmless from the exact claims brought against it below." The Trust filed a proposed final judgment that included the following in relevant part:

VII.

It is therefore, ORDERED that FINAL JUDGMENT is hereby rendered in this matter:

. . . .

AS TO DEFENDANT THE TRUST'S INDEMNITY CLAIM:

(8) Defendant The Jasper/VPPA Settlement Trust shall have and recover actual damages from Plaintiff Sam Rayburn Municipal Power Agency in the amount of $391,519.91, as the Trust's reasonable and necessary fees and expenses incurred to date in defending against Plaintiff's claims in this litigation. In the event of an appeal of this Final Judgment by Plaintiff to the court of appeals, if the appeal is unsuccessful, Defendant The Jasper/VPPA Settlement Trust shall have and recover further damages from Plaintiff Sam Rayburn Municipal Power Agency in the amount of $50,000.00 as its reasonable appellate fees in that court; and in the event of an appeal by Plaintiff to the Supreme Court of Texas, if the appeal is unsuccessful, Defendant The Jasper/VPPA Settlement Trust shall have and recover further damages from Plaintiff Sam Rayburn Municipal Power Agency in the amount of

$25,000.00 as its reasonable appellate fees in that court. Post-judgment interest will accrue on this judgment at a rate of 5% per annum until the judgment is paid by Plaintiff;

(9) All costs of court incurred by Defendant The Jasper/VPPA Settlement Trust in this matter shall be taxed against, and payable by, Plaintiff Sam Rayburn Municipal Power Agency; and

(10) All relief not expressly granted in this Judgment is hereby denied.

The Trust filed its Motion for Entry of Final Judgment on Jury's Verdict and on Its Counterclaim for Indemnity, and argued that, because the jury found no liability against the Trust, "the Trust is entitled to entry of Final Judgment in its favor that SRMPA take nothing by way of all of its claims and allegations against the Trust[,]" and that "[t]he Trust is also entitled to judgment in its favor against SRMPA for all of the costs of court incurred by SRMPA in this matter." At the hearing on the motion, the trial court discussed its ruling on the indemnity as follows:

> THE COURT: . . . I think I'm going to find that [SRMPA], by virtue of that contract and that [] clause, did not indemnify them for this -- this type of action; and, so, I am definitely going to take out No. 8.
>
> [Counsel for the Trust]: That's fine, Your Honor. I would suggest, one, that the Court could simply take that out by just circling the whole paragraph, marking it out, and initialing it, I think, would be sufficient. But I would say that No. 9, because they did not prevail on their claims against us, we're still entitled to costs of court.
>
> THE COURT: . . . I didn't question it.
>
> [Counsel for the Trust]: Thank you.

47

THE COURT: That was another reason I was thinking about awarding it was because it could be viewed as a frivolous lawsuit, or frivolous. Obviously, they had a -- they had a point to make and tried to do that with that.

So, I am, on Page 5 [of the Trust's proposed final judgment], going to mark that out and rule in the bifurcated trial that the settlement trust is not entitled to indemnity by [SRMPA] at this time.

The parties both argue that the language in the indemnity provision is unambiguous. The parties disagree on the application of the indemnity language. By its plain language, the provision in question is an indemnity provision. As a general rule, an indemnity provision does not apply to claims between the parties to an agreement. *See Claybar v. Samson Expl., LLC*, No. 09-16-00435-CV, 2018 Tex. App. LEXIS 928, at *7 (Tex. App.—Beaumont Feb. 1, 2018, pet. filed); *Nat'l City Mortg. Co. v. Adams*, 310 S.W.3d 139, 144 (Tex. App.—Fort Worth 2010, no pet.); *MG Bldg. Materials, Ltd. v Moses Lopez Custom Homes, Inc*., 179 S.W.3d 51, 63 (Tex. App.—San Antonio 2005, pet. denied); *Ganske v. Spence*, 129 S.W.3d 701, 708 (Tex. App.—Waco 2004, no pet.); *Wallerstein v. Spirt*, 8 S.W.3d 774, 780 (Tex. App.—Austin 1999, no pet.); *Derr Constr. Co. v. City of Houston*, 846 S.W.2d 854, 858 (Tex. App.—Houston [14th Dist.] 1992, no writ). For the Trust to make the claim that it is entitled to indemnification, the Trust bears the burden to prove that the indemnity provision is applicable, that is, that a third party has filed a claim against the Trust, or the indemnity clause expressly includes language indicating that

48

it also applies to direct claims between the indemnitor and indemnitee. *See generally MG Bldg. Materials, Ltd.*, 179 S.W.3d at 63; *Ganske*, 129 S.W.3d at 708; *Coastal Transp. Co. v. Crown Centr. Petroleum Co.*, 20 S.W.3d 119, 130 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). We conclude that on this record the Trust has not met its burden. In denying the Trust's indemnity counterclaim, the trial court stated on the record that the indemnity provision was not triggered by "this type of action[.]" We agree, and we overrule the Trust's issue on cross appeal.

Having overruled Appellant's and Cross-Appellants' issues, we affirm the trial court's judgment.

AFFIRMED.

 

_____
LEANNE JOHNSON
Justice

Submitted on March 13, 2018
Opinion Delivered July 26, 2018

Before McKeithen, C.J., Kreger and Johnson, JJ.

49